Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
Panel Especial

| | | |
|---|---|---|
| CONSEJO DE TITULARES CONDOMINIO ASHFORD MEDICAL y OTROS<br><br>Apelados<br><br>v.<br><br>CAPARRA 5, LLC y OTROS<br>Apelante | KLAN202400222 | Apelación procedente del Tribunal de Primera Instancia Sala de San Juan<br><br>*Caso Núm.*<br>SJ2020CV04501<br>SJ2020CV05347<br><br>Sobre:<br>Cobro de Dinero |

Panel integrado por su presidente, el Juez Bermúdez Torres, el Juez Adames Soto y la Juez Aldebol Mora

Adames Soto, Juez Ponente

## **SENTENCIA**

En San Juan, Puerto Rico, a 27 de septiembre de 2024.

Comparece Caparra 5, LCC., (Caparra 5 o apelante) solicitando que revoquemos una *Sentencia Parcial* emitida el 2 de noviembre de 2023, por el Tribunal de Primera Instancia, Sala Superior de San Juan, (TPI). Mediante este dictamen, el foro apelado declaró *Ha Lugar* una *Solicitud de Sentencia Sumaria* instada por el Consejo de Titulares del Condominio Ashford Medical (Consejo de Titulares) contra Caparra 5. Habiendo Caparra 5 cuestionado ciertos edictos de subasta, el foro primario determinó que estos cumplieron con los requisitos de ley, y cabía considerar al primero como un adquiriente voluntario de sendos inmuebles para todos los efectos que ello conlleva ante el pago de las deudas de cuotas de mantenimiento, conforme lo dispone la *Ley de Condominios,* Ley Núm. 104 de 25 de junio de 1958, según enmendada, 31 LPRA sec. 1291 *et seq.* (Ley de Condominios).[1] No obstante, el TPI

---

[1] Ley aplicable a los hechos del caso de epígrafe.

NÚMERO IDENTIFICADOR

SEN2024_____

también consideró que persistían ciertos hechos esenciales en controversia que debían ser dirimidos en juicio plenario, de aquí que el dictamen fuera solo parcial.

Caparra 5 alza ante nosotros los argumentos por los cuales se opuso ante el tribunal *a quo* a que dispusiera sumariamente de la controversia que adelantamos en el párrafo que precede. Sin embargo, no nos convence, decidimos *Confirmar*.

## I. Resumen del tracto procesal

El tracto procesal en este caso es extenso, por lo que solo nos proponemos a exponer aquellos datos que ayuden a colocar al lector en perspectiva de los asuntos que tenemos que dilucidar.

El 24 de agosto de 2020, el Consejo de Titulares presentó una *Demanda* sobre cobro de dinero en contra de Caparra 5 en el caso SJ2020CV04501. En lo relevante, el Consejo de Titulares afirmó allí que las Oficinas 803 y 804 (Oficinas) ubicadas en el Condominio Ashford Medical eran propiedad de la señora Frances Francheschi (señora Francheschi) y que, por motivo de falta de pago de las cuotas de mantenimiento, había presentado anteriormente una demanda en cobro de dinero contra esta, en el caso KCD2014-0081. Continuó indicando que, como resultado de la acción en cobro llevada en contra de la señora Francheschi, el foro primario había dictado una *Sentencia* en su contra, ordenando el pago de $47,530.71 por concepto de cuotas de mantenimiento atrasadas. A su vez, el Consejo de Titulares aseveró que el Banco Popular de Puerto Rico, (Banco Popular), llevó a cabo dos procesos judiciales de ejecución de hipoteca con referencia a los referidos inmuebles: (1) el KCD2009-1926 sobre la Oficina 803 del Condominio Ashford Medical; (2) el 18 CV 01377 en el Tribunal Federal sobre la Oficina 804 del Condominio de Ashford Medical. Condominio Ashford Medical entonces adujo que, previo a la celebración de la subasta objeto

de ambos procesos de ejecución, Condado 3 CR2, LLC., (Condado 3), adquirió los pagarés hipotecarios, por lo cual fue sustituido como parte demandante en ambos procedimientos. Según señaló el Consejo de Titulares, al momento de las subastas, ambas unidades adeudaban la suma de $157,238.00 por concepto de cuotas de mantenimiento, derramas, intereses, recargos y penalidades.

A raíz de lo anterior, el Consejo de Titulares continuó arguyendo que Caparra 5 compareció a los procesos de subastas celebrados para ambos inmuebles tanto en el foro estatal como el federal, producto de lo cual adquirió voluntariamente ambas propiedades. Por causa de esto, sostuvo Condominio Ashford Medical, Caparra 5 se obligó de forma solidaria al pago de $157,238.00, por concepto de cuotas de mantenimiento, derramas, intereses, recargos y penalidades acumuladas hasta el mes de julio de 2020. De aquí que el Condominio Ashford Medical solicitara al Tribunal que le ordenara a Caparra 5 a pagar las cuotas de mantenimiento adeudadas por ambos inmuebles.

En respuesta, el 5 de marzo de 2021, Caparra 5 presentó *Contestación a Demanda, Reconvención y Demanda contra tercero.* En lo pertinente, alegó que compareció a las subastas de las oficinas mediante treta, engaño y dolo por parte de: Condado 3, el señor Ramírez de Arellano, el señor Julio Quiles y el Consejo de Titulares. Esgrimió que el señor Julio Quiles, en su carácter de administrador del Condominio Ashford Medical, le brindó información parcial sobre los inmuebles que adquirió, puesto que no le comunicó que tenían una deuda de alrededor de $159,000.00 por cuotas de mantenimiento. Asimismo, aseveró que el señor Ramírez de Arellano, como representante legal de Condado 3, actuó de mala fe y no incluyó en el edicto sobre las oficinas que estas tenían una deuda que el comprador tendría que asumir. Sobre esto añadió que los edictos solo indicaban que las propiedades se adquirirían

*libres de cargas y gravámenes posteriores,* sin alusión a las deudas aludidas, ni informar sobre las consecuencias económicas adicionales para las personas que las adquirieran. En la misma tónica, sostuvo que tales edictos constituían anuncios engañosos, siendo nulos, pues incumplían con la Regla 51.8 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 51.8, y con el Artículo 102 de la *Ley del Registro de la Propiedad Inmobiliaria del Estado Libre Asociado de Puerto Rico,* Ley Núm. 210-2015 (30 LPRA sec. 6139), (Ley Hipotecaria).

Además, Caparra 5 adujo que Condado 3 era una corporación ilegal, por dedicarse a la compra y venta de bienes inmuebles para propósitos especulativos. Finalmente, Caparra 5 arguyó que la falta de buena fe descrita, y el silencio que se mantuvo sobre la deuda de mantenimiento que afectaba a las oficinas, vició su consentimiento. De conformidad, solicitó que se declarara nula la subasta y se ordenara la devolución de lo pagado.

También, el 2 de octubre de 2020, Caparra 5 incoó una *Demanda* sobre nulidad de subasta en el caso SJ2020CV05347, en contra de las siguientes: Condado 3; Consejo de Titulares, SARLAW LLC, el señor Julio Quiles y compañías de seguros X, Y, Z. En esencia, este levantó similares alegaciones a las enumeradas en su *Contestación a Demanda, Reconvención y Demanda contra tercero* en el caso SJ2020CV04501. Añadió una petición para que se declararan nulas las subastas y se ordenara la devolución de lo que había pagado.

Ante esto, el 25 de enero de 2021, SARLAW, LCC, presentó *Contestación a la Demanda.* Esgrimió que: (1) la referida demanda no aducía hechos que justificaran la concesión de un remedio; (2) en ningún momento SARLAW, LLC compareció o formó parte del caso civil KCD2009-1926; (3) en ningún momento anterior a la subasta, Caparra 5 le hizo preguntas sobre posibles deudas de mantenimiento de la

propiedad subastada; (4) cualquier daño sufrido o incurrido por Caparra 5 fue por negligencia o deficiencia de asesoramiento legal; y (6) el Tribunal no tenía jurisdicción sobre los procedimientos celebrados en la Corte Federal para el Distrito de Puerto Rico.

Ese mismo día, el señor Ramírez de Arellano también presentó *Contestación a la demanda.* Los argumentos planteados coincidieron con los enumerados en el párrafo que antecede, según levantados por SARLAW, LLC.

De igual forma, Condado 3 presentó *Contestación a Demanda.* Arguyó que las subastas celebradas, que intentaba impugnar Caparra 5, cumplieron con todos los requisitos de derecho aplicables. Afirmó ser el tenedor de los pagarés hipotecarios y la persona con derecho a exigir su cumplimiento en los casos civiles KCD2009-1926 y 18CV01377. Adujo que cualquier daño sufrido por Caparra 5 fue autoinfligido, por causa de sus acciones u omisiones.

Asimismo, Consejo de Titulares presentó *Contestación a la Demanda.* Tal como los demás demandados, alegó que la subasta bajo examen había cumplido con todos los requisitos de ley, por tanto, resultaba vinculante. Por tanto, sostuvo que Caparra 5 estaba obligado por sus resultados, puesto que adquirió de forma voluntaria y asumió solidariamente las deudas de mantenimiento, derramas, recargas e intereses. Imputó negligencia a Caparra 5, al no requerir la información necesaria para tomar una decisión informada, y esto no podía entenderse como una excusa para pretender burlar las obligaciones que contrajo. Sobre este mismo tema, arguyó que, de Caparra 5 haber visitado el Registro de la Propiedad, hubiese constatado que sobre la entonces titular se había anotado un gravamen en la sección de Registro de Sentencias. En cuanto a la subasta llevada a cabo en el Tribunal federal sobre la oficina 803, señaló que en el aviso de subasta de dicho foro se

advirtió que se debían revisar los gravámenes preferentes con sus respectivos tenedores.[2]

El señor Ramírez de Arellano presentó *"Segunda" Contestación Enmendada a la Demanda.* En lo pertinente, aceptó que Condado 3 contrató a SARLAW, LLC para llevar a cabo las subastas. Negó haber sido preguntado por persona alguna sobre la existencia de cuotas de mantenimiento acerca de las propiedades objetos del presente pleito. También, señaló que los edictos de las subastas celebradas por Condado 3, notificaban que *se entenderá que todo licitador acepta como bastante la titulación que se transmite y que las cargas y gravámenes anteriores y las preferentes, si las hubiere, al crédito ejecutante, continuarán subsistentes, entendiéndose que el rematante las acepta y queda subrogado en la responsabilidad de las mismas, sin destinarse a su extinción al precio del remate.[3]* Así, argumentó que no existía fundamento legal para declarar nulas las subastas celebradas por Condado 3. Conforme a lo anterior, explicó que la ley aplicable no requería que Condado 3 publicara o certificara al Tribunal o a terceros, posibles deudas de mantenimiento de las oficinas subastadas. Por último, esbozó que, al momento de celebrarse las subastas, Caparra 5 tenía conocimiento de las deudas de mantenimiento.

A su vez, el señor Julio Quiles presentó *Contestación a Demanda.* Explicó que él no era el administrador del condominio, sino que era empleado de la compañía que administra el Condominio Ashford Medical. Manifestó que, como empleado del administrador del edificio, actuó de buena fe, de forma prudente, como un buen padre de familia y

---

[2] "Potential bidders are advised to verify the extent of preferential liens with the holders thereof. It shall be understood that each bidder accepts as sufficient the title and that prior preferential liens to the one being foreclosed upon, including but not limited to any property tax, liens, (express, tacit, implied or legal), shall continue in effect it being understood further that the successful bidder accepts them and is subrogated in the responsibility for the same and that the bid price shall not be applied toward their cancellation." Anejo 12 del recurso de apelación, pág. 69.

[3] Anejo 12 del recurso de apelación, pág. 65.

conforme a sus responsabilidades. Esgrimió que le brindó toda la información requerida a Caparra 5. Concluyó afirmando que Caparra 5 tenía la obligación de hacer la diligencia mínima en torno a la propiedad que pretendía adquirir.

Ante ello, el 27 de abril de 2021,[4] el TPI emitió *Orden* consolidando el caso SJ2020CV053747 con el SJ2020CV04501.

Superados varios asuntos procesales, el 5 de abril de 2023, el Consejo de Titulares presentó una *Solicitud de Sentencia Sumaria.* En esencia, luego de proponer una serie de hechos incontrovertidos, sostuvo que Caparra 5 era un adquiriente voluntario que mediante la adjudicación de la subasta asumió la obligación de pago de las deudas que mantenía la propiedad, entre estas, las cuotas de mantenimiento adeudadas. Argumentó que Caparra 5 tuvo amplia oportunidad para indagar sobre el estado de las propiedades y llevar a cabo el *due diligence* que todo hombre prudente y razonable debía realizar. Aseveró que el que Caparra 5 no hubiese desplegado un mínimo de diligencia, no podía ser una excusa o causa para incumplir con las obligaciones que contrajo. Abundó sobre esto último, que las veces que el señor Omar Torres, principal de Caparra 5, visitó al Condominio, no inquirió o preguntó sobre las deudas de mantenimiento que tenían las oficinas objeto del proceso de subasta. También, señaló que, de una simple lectura de los edictos surgía que habían unas sentencias que gravaban las propiedades por deudas en concepto de cuotas de mantenimiento. Por otra parte, afirmó que, previó a la celebración de la subasta, Condado 3 había logrado un acuerdo para adquirir la propiedad y tener un descuento por concepto de cuotas de mantenimiento, y Caparra 5 pudo o debió hacer lo mismo, en la eventualidad de que fuese a licitar, si hubiese llevado a cabo su *due diligence.*

---

[4] Notificada el 29 de abril de 2021.

Ese mismo día, el 5 de abril de 2023, Caparra 5 también presentó *Moción Solicitando Sentencia Sumaria.* Luego de enumerar una serie de hechos que propuso como incontrovertidos, afirmó que el señor Julio Quiles le informó sobre todo lo relacionado a las oficinas, excepto lo relativo a la deuda en las cuotas de mantenimiento. Por ello, sostuvo que intervino vicio en el consentimiento, lo que daba lugar a la anulación del contrato efectuado mediante la subasta. Añadió que el edicto anunciando la subasta padeció de un error sustancial, puesto que, si la deuda por las cuotas de mantenimiento se tenía como una carga preferente, tenía que así incluirlo o informarlo. Arguyó que tal inexactitud del edicto conllevaba la nulidad de la subasta, más daba lugar al reclamo de daños y perjuicios. Adujo que Condado 3 estableció en el edicto que la compra se haría sin la obligación de asumir el pago de los gravámenes posteriores o *junior liens,* de modo que no podía reclamársele dicho pago. Concluyó afirmando que tanto Condado 3, como el señor Ramírez de Arellano, incumplieron con el inciso 3 del Art. 102 de la Ley Hipotecaria, *infra.*

En la alternativa, la misma parte arguyó en su moción dispositiva que la deuda de las cuotas de mantenimiento surgía de una anotación posterior al gravamen que se ejecutó, y, por orden de prelación, debía entenderse como eliminada al ser un gravamen posterior o *junior liens.* Finalmente, adujo que procedía que se anulara el contrato efectuado mediante la subasta, ante el silencio precontractual mostrado por el Consejo de Titulares, el señor Julio Quiles, Condado 3 y el señor Ramírez de Arellano, que constituyó mala fe.

De igual forma, Condado 3 presentó su *Moción Solicitando Sentencia Sumaria.* En lo pertinente, expuso que Caparra 5 advino solidariamente responsable por el pago de las cuotas de mantenimiento acumuladas por el titular anterior, las cuales voluntariamente aceptó,

por disposición legislativa. Afirmó haber cumplido con todos los requisitos estatutarios al publicar el correspondiente aviso de subasta, incluyendo todo gravamen que surgía del Registro de la Propiedad, conforme al expediente judicial, en cumplimiento con la Ley del Hipotecaria, *infra.* Sobre lo mismo, planteó que no existía disposición legal que obligara a un acreedor de una hipoteca a incluir en el aviso de subasta, cargas o gravámenes estatutarios que no surgieran del Registro de la Propiedad. De este modo, esgrimió que Caparra 5 tenía la obligación de revisar las cargas estatutarias, tales como las cuotas de mantenimiento y contribución sobre las propiedades, que pudiesen afectar los inmuebles objeto de pública subasta, antes de comparecer a licitar. Finalmente, alegó que nunca existió relación contractual y/o extracontractual entre Condado 3 y Caparra 5.

Por su parte, el señor Sergio A. Ramírez de Arellano presentó *Moción Solicitando que se dicte Sentencia Sumaria.* En primer lugar, señaló que tanto la participación de SARLAW, LLC., como la suya, se limitó a la preparación del edicto publicado, así como la supervisión del proceso de subasta. Además, afirmó que el edicto de la subasta federal cumplía con toda la información y advertencias establecidas en ley, pero que Caparra 5 estaba privada de presentar una causa de acción toda vez que el Tribunal carecía de jurisdicción sobre el procedimiento llevado a cabo en el Tribunal Federal.

Por otro lado, con relación a la subasta estatal, el señor Ramírez de Arellano adujo que, de igual forma, cumplió con todos los requerimientos estatutarios de la Regla 51.7 de las de Procedimiento Civil, *infra,* y el Artículo 102 de la Ley Hipotecaria, *infra.*, satisfaciendo cabalmente su propósito de darle publicidad y notificar, así como el de informar, a los licitadores sobre la condición existente de las oficinas. Asimismo, alegó que el edicto de subasta claramente contenía un párrafo exclusivamente

dirigido a avisar que todo licitador aceptaba las cargas y gravámenes anteriores y los preferentes como subsistentes, así como que el rematante aceptaba los mismos, quedando subrogado en la responsabilidad de estos, sin destinarse a su extinción el precio del remate. Argumentó que no había defecto sustancial o fundamental en el contenido de los edictos de subasta estatal y federal diligenciados que propiciaran la nulidad de estos, por lo que no había fundamento legal que sostuviera las alegaciones de Caparra 5. Visto lo cual, afirmó que Caparra 5 era un adquirente voluntario de las oficinas subastadas, y como tal, responsable solidariamente del pago de las sumas adeudadas por concepto de cuotas de mantenimiento vencidas.

Por su parte, Caparra 5 instó *Oposición a "Moción solicitando que se dicte Sentencia Sumaria" presentada por SARLAW y Sergio Ramírez de Arellano.* En resumen, reiteró que el edicto publicado no cumplió con el Art. 102 de la Ley del Registro de la Propiedad, *infra*, por lo cual el proceso de subasta resultó nulo. Caparra 5 sostuvo que la omisión de la suma de los gravámenes preferentes que tendría que asumir el comprador fue un error fundamental del edicto. También, argumentó que el comprador no respondería o no tendría que asumir los gravámenes posteriores al gravamen ejecutante, fundamentándose en que la deuda de cuotas de mantenimiento de las oficinas estaba anotada e identificada en el edicto como gravamen posterior. Por otra parte, reiteró que Ramírez de Arellano no le brindó información que, de haberse divulgado, hubiese tenido el efecto de Caparra 5 no haber adquirido las propiedades.

Condado 3 presentó *R[é]plica a Solicitud de Sentencia Sumaria radicada por Caparra 5, LCC.* En lo pertinente, Condado 3 reiteró las alegaciones presentadas anteriormente: (1) que nunca existió relación contractual o extracontractual entre Condado 3 y Caparra 5; (2) era obligación de Caparra 5 realizar la investigación sobre el negocio que se

proponía a realizar; (3) no era requisito incluir en el aviso de subasta las hipotecas tácitas y/o gravámenes estatutarios, sino que solamente es requisito incluir los gravámenes preferentes o posteriores que surgen del Registro de la Propiedad; y (4) la obligación de un titular por su parte proporcional de los gastos comunes constituye un gravamen que será exigible a quien sea titular de la propiedad.

Consejo de Titulares presentó R*éplica a Solicitud de Sentencia Sumaria.* En lo pertinente, reiteró sus argumentos atinentes a que: (1) todo licitador que acude a una subasta pública tiene el deber de realizar las indagaciones necesarias para tomar una decisión informada; (2) Caparra 5 no actuó como un hombre prudente y razonable; (3) Caparra 5 como adquiriente voluntario es responsable solidariamente del pago de la deuda que recae sobre las oficinas; (4) surge de los edictos para la subasta que habían unas sentencias que gravaban las referidas propiedades por deudas en concepto de cuotas de mantenimiento; (5) el tribunal no tiene jurisdicción para dejar sin efecto una subasta ordenada en el Tribunal Federal; y (6) Caparra 5 no cuestionó en el proceso de licitación la validez y corrección del edicto que impugna.

Caparra 5 presentó *Oposición a Moción Solicitando Sentencia Sumaria presentada por el Consejo de Titulares Condominio Ashford Medical.* Alegó que, conforme al edicto, el comprador no sería responsable del pago de gravámenes posteriores o *junior liens* al que está ejecutando. A tenor, esgrimió que la sentencia obtenida por el Consejo de Titulares en el caso K CD2014-0081 fue anotada posterior al crédito que Condado 3 se encontraba ejecutando. En consecuencia, sostuvo que la deuda quedó cancelada, pues el edicto de subasta disponía que las propiedades se adquirirían libre de cargas y gravámenes. Además, señaló que, en la alternativa, el edicto constituyó un anuncio engañoso, por consiguiente, debía declararse nulo. Por otra parte, alegó que la

actuación de los codemandados violó el deber de lealtad y buena fe en la negociación, al mantener silencio precontractual, de modo que responden por los daños causados.

Luego del TPI haber considerado las mociones dispositivas aludidas, junto a los escritos en oposición, emitió la *Sentencia Parcial* cuya revocación nos solicita Caparra 5. Como parte de su dictamen, el foro primario identificó los siguientes hechos como incontrovertidos:

1. El Consejo Ashford Medical es una entidad con personalidad jurídica para demandar y ser demandada, de conformidad con el artículo 38 de la Ley de Condominios (31 LPRA sec. 1293b). Su dirección postal y física es Ashford Medical Center, 29 Ave. Ashford 1415, Suite 801, San Juan, Puerto Rico 00907-1503.
2. Caparra 5 es una corporación de responsabilidad limitada, inscrita bajo el número registro 421640. Según consta en el certificado de organización en el Departamento de Estado, la dirección física de la propiedad es Carretera #2, Solar #5, Pueblo Viejo, Guaynabo, Puerto Rico 00969; y dirección postal Condominio Taft, 60 Taft Apt. PH, San Juan, Puerto Rico 00911.
3. El Condominio Ashford Medical Center es un edificio de nueve (9) niveles para uso comercial (vestíbulo) y de oficinas médicas (pisos 1 al 9), organizado bajo la Ley de Condominios. El referido condominio se constituye al tenor de la escritura número cuatro (4) del 16 de enero de 1963, ante el notario Rafael Martínez Álvarez.
4. Las oficinas 803 y 804 ("Propiedades") están sitas en el Condominio Ashford Medical.
5. En o para el mes de marzo de 2015, las oficinas número 803 y 804 eran propiedad de la Dra. Frances Francheschini. Por motivo de falta de pago, el Consejo Ashford Medical presentó demanda civil para el cobro de las cuotas de mantenimiento vencidas, el cual se le asignó el número de caso KCD2014-0081.
6. El 10 de marzo de 2015, en el caso civil KCD2014-0081, se dictó sentencia a favor del Consejo Ashford Medical, condenando a la Dra. Francheschini al pago de $47,530.71 por concepto de cuotas de mantenimiento atrasadas.
7. El 29 de mayo de 2015, el Consejo Ashford Medical presentó la sentencia del caso civil número KCD2014-0081 en el Registro de la Propiedad.
8. Cuando se emitió la sentencia, las Propiedades mantenían gravámenes hipotecarios que se describen a continuación:
   A. Oficina 804, Finca 18672, Santurce Norte, folio 52 del Tomo 516. Esta finca mantenía un gravamen hipotecario por la suma principal de $231,750.00 según consta en escritura pública número 105

otorgada el 5 de marzo del 2005 ante el notario José Laborde Corretjer.

B. Oficina 803, Finca 18567, Santurce Norte folio 147, tomo 661. Esta finca mantenía un gravamen hipotecario por la suma principal de $231,750.00 según consta en escritura pública número 106 otorgada el 30 de marzo del 2005 ante el notario, José Laborde Corretjer.

9. Debido a la falta de pago de los préstamos con garantía hipotecaria descritas en el párrafo que precede, el Banco Popular de Puerto Rico comenzó dos procesos judiciales para la ejecución de estas hipotecas. Estos casos fueron el caso civil KCD2009-1926 (en relación con la Oficina 803) y el caso número 18-1377 (DRD) (en relación con la Oficina 804) ante el Tribunal de Distrito Federal. Ambos casos concluyeron con procesos de subastas judiciales para hacer efectiva la sentencia habida en cada uno de ellos.

10. Previo a la celebración de la subasta objeto de ambos procesos de ejecución de hipoteca, el codemandado Condado 3, adquirió los pagarés hipotecarios objeto de ejecución, por lo que solicitó ser sustituido como parte demandante. Esto fue aceptado por el tribunal federal y el estatal.

11. Condado 3 es una compañía de responsabilidad limitada, organizada y existente bajo las leyes del estado de Delaware.

12. Condado 3 quedó debidamente autorizada a realizar negocios en el Estado Libre Asociado de Puerto Rico desde el 1 de junio de 2018 hasta el 29 de diciembre de 2022.

13. Condado 3 se dedica al análisis, adquisición, "servicing" y disposición a préstamos industriales y comerciales.

14. El préstamo con garantía hipotecaria que adquirió Condado 3 fue originado por Doral Mortgage, luego adquirido por el Banco Popular de Puerto Rico y finalmente por la parte demandada Condado 3.

15. Condado 3 era el tenedor del pagaré sobre la propiedad Oficina 803 y, por ende, la persona con derecho a exigir su cumplimiento del pagaré por la suma de $231,750.00, con intereses al 7.75% anual fechado 30 de marzo de 2005, y otorgado ante el notario público Jorge Laborde Corretjer, garantizado mediante hipoteca número 106 de esa misma fecha ante el mismo notario.

16. Condado 3 era el tenedor del pagaré sobre la propiedad Oficina 804 y, por ende, la persona con derecho a exigir su cumplimiento del pagaré por la suma de $231,750.00, con intereses al 7.75% anual fechado 30 de marzo de 2005, y otorgado ante el notario público Jorge Laborde Corretjer, garantizado mediante hipoteca número 105 de esa misma fecha ante el mismo notario.

17. Condado 3, como acreedor hipotecario promovente de ejecución de sentencia mediante pública subasta ante la Corte de Distrito de Puerto Rico bajo el caso *Condado 3 CR2, LLC v. Frances Franceschi Nazario*, número 18-CV-01377 (DRD), señaló la venta en virtud de aviso de subasta con fecha de 13 de enero de 2020 del inmueble descrito a continuación:

---URBANA: Propiedad Horizontal: Oficina Número 8-3 G del Condominio Ashford Medical Center, es una oficina de forma rectangular cuyas medidas son: 29 pies 6 pulgadas de largo por 20 pies 0 pulgadas de ancho con un área privativa de aproximadamente 587.44 pies cuadrados, equivalentes a aproximadamente 54.59 metros cuadrados. Sus colindancias son las siguientes: En el NORTE, con la oficina número B2G; en el SUR, con la oficina número 8-4G; en el ESTE, con el corredor; y en el OESTE, con la pared exterior del edificio. En el edificio que es frente a la Avenida Washington, su entrada principal se encuentra en la colindancia Este y da acceso al corredor del piso correspondiente. Le corresponde un derecho de propiedad en común pro-indiviso sobre los elementos comunes generales y restringidas del edificio equivalentes a 0.99% del total.

---Inscrita al folio 186 del tomo 1131 de Santurce Norte, Registro de la Propiedad de San Juan, Sección Primera, Finca 18,567.

18. Condado 3, como acreedor hipotecario promovente de ejecución de sentencia mediante pública subasta bajo el caso *Condado 3 CR2, LLC v. Frances Franceschi Nazario*, número K CD2009-1926, señaló la venta en virtud de aviso de subasta fechado 13 de enero de 2020 del inmueble descrito a continuación:

---URBANA: Oficina #8-4G del Condominio Ashford Medical Center de forma irregular cuyas medidas son 29'6" de largo por 20' de ancho con un área de 587.54 pies cuadrados, equivalentes a 54.60 metros cuadrados, equivalentes a 54.60 pies cuadrados. En lindes por el NORTE, con la oficina #8-3G; por el SUR, con la oficina #8-5G; por el ESTE, con el corredor y por el OESTE, con la pared exterior que da al solar y enfrente a la Avenida Washington. Se hace constar que por motivos de ornamentación, las porciones de pared correspondientes al ángulo Sureste de esta oficina han sido eliminadas, habiéndose construido una aparente colindancia Sureste dentro del área privativa de forma semicircular y corresponde a un círculo de 13' de radio cuyo centro ubica en un punto imaginario situado en el centro del pasillo y equidistante a las paredes semicirculares similares correspondientes a las oficinas #8-5G, ##8-6G y #8-7G, con las cuales completa el círculo citado. Su entrada principal se encuentra en la pared Sureste semicircular citada y da acceso al corredor del piso correspondiente. Le corresponde derecho de propiedad con común pro-indiviso sobre los elementos comunes generales y restringidos del edificio equivalentes a 0.99%.

---Inscrita al folio 273 del tomo 873 de Santurce Norte, Registro de la Propiedad de San Juan, Sección Primera, Finca 18,672.

19. La primera subasta para la Oficina 804 (también conocida como "8-4G") para el caso KCD2009-1926 ante el Tribunal de Primera Instancia Puerto Rico se llevaría a cabo el 19 de febrero de 2020, la segunda subasta el

26 de febrero de 2020 y la tercera subasta el 5 de marzo de 2020.

20. Del Edicto de Subasta del caso KCD2009-1923 surge que la hipoteca objeto de ejecución era la siguiente:

HIPOTECA: Por la suma principal de $231,750.00 en garantía de un pagaré a favor de METRO ISLAND MORTGAGE, INC., o a su orden, con intereses al 7.75% anual y vencimiento el 1ro. de abril de 2020, tasada en $231,750.00, constituida mediante escritura Número 105 otorgada en San Juan el 5 de marzo de 2005, ante Jorge Laborde Corretjer, inscrita al folio del tomo 1118 de Santurce Norte, finca Número 18672, inscripción 12ª.

21. Del edicto de subasta del caso KCD2009-1923 se desprende que la Oficina 804 se encontraba afecta a gravámenes posteriores a la hipoteca objeto de ejecución, incluyendo una Sentencia emitida por el Tribunal de Primera Instancia de San Juan del caso civil número KCD2014-0081. Este dispone específicamente que:

SENTENCIA: En el Tribunal de Primera Instancia de San Juan, en el Caso Civil Número KCD2014-0081 (505), con fecha 10 de marzo del 2015 por Cobro de Dinero, seguido por Consejo de Titulares Condominio Ashford Medical Center, versus Titular Registral por la suma principal de $47,530.71, más costas, gastos e intereses, anotado el 29 de marzo del 2015 al folio 69, del libro de Sentencias Número 8.

22. El Edicto de Subasta del caso KCD2009-1923 dispone como aviso que:

Se entenderá que todo licitador acepta como bastante la titulación que se transmite y que las cargas y gravámenes anteriores y las preferentes, si las hubiere, al crédito del ejecutante, continuarán subsistentes, entendiéndose que el rematante las acepta y queda subrogado en la responsabilidad de las mismas, sin destinarse a su extinción el precio del remate.

23. La primera subasta para la Oficina 803 del caso 18-CV-01377 ante el Tribunal Federal se llevaría a cabo el 13 de febrero de 2020, la segunda subasta se llevaría a cabo el 20 de febrero de 2020 y la tercera subasta se llevaría a cabo el 27 de febrero de 2020.

24. Del Notice of Sale del caso federal 18-CV-01377 surge que la hipoteca sujeta a ejecución es la siguiente:

MORTGAGE: In the principal amount of $231,750.00, securing a note payable to METRO ISLAND MORTAGAGE, INC., or its order, with yearly interests set at 7.75%, due on April 1st, 2020, appraised at $231,750.00, as per Deed No. 6, executed in San Juan on March 30th, 2005 before Notary Public Jorge Laborde Corretjer, recorded at page 81 of volume 1131 of North Santurce, property Number 18567, 16th inscription.

25. El Notice of Sale del caso ante el Tribunal Federal, bajo la sección de "Junior Liens", la sentencia del caso civil número KCD2014-081 (505) que dispone específicamente que:

> JUDGEMENT: Given at the First Instance Court, San Juan Branch, Civil Case No. KCD2014-0081 (505), dated March 10, 2015, of Collection of Monies, followed by Consejo de Titulares Condominio Ashford Medical Center v. Owner of this property, in the principal amount of $47,530.71, plus interests and costs, annotated on May 29, 2015, at page 69 of Judgement Books Number 8.

26. El Notice of Sale del caso ante el Tribunal Federal dispone como aviso que:

> Potential bidders are advised to verify the extent of preferential liens with the holders thereof. It shall be understood that each bidder accepts as sufficient the title and that prior and preferential liens to the one being foreclosed upon, including but not limited to any property tax, liens (express, tacit, implied or legal), shall continue in effect it being understood further that the successful bidder accepts them and is subrogated in the responsibility for the same and that the bid shall not be applied toward their cancellation. The present property will be acquired free and clear of all junior liens.

27. Caparra 5 es una corporación de responsabilidad limitada creada al tenor de las Leyes del Estado Libre Asociado de Puerto Rico, cuyo miembro director de la corporación lo es el Sr. Omar Torres Lozada.

28. El 11 de febrero de 2020, ante el hecho que Condado 3 era el acreedor hipotecario de ambas propiedades, y ante el hecho de que las propiedades serían motivo de un proceso de subasta, Condado 3 y el Consejo Ashford lograron un acuerdo de transacción condicionado mediante el cual, en la eventualidad de que Condado 3 resultara el licitador agraciado en los procesos de pública subasta, esta pagaría la suma total de $95,000.00, como pago por la deuda objeto de las cuotas de mantenimiento.

29. La primera subasta de la unidad 803 en el caso 18-CV-01377 ante el Tribunal Federal se llevó a cabo el 20 de febrero de 2020, en la cual estuvo presente Nancy Lozada, como representante de Caparra 5, quien no licitó.

30. El 20 de febrero de 2020, se llevó a cabo la segunda subasta de la unidad 803 en el caso 18-1377 del Tribunal Federal. A dicha subasta compareció Caparra 5, por conducto de Nancy Lozada quien licitó y adquirió la unidad 803 por la suma de $155,500.00. Condado 3 licitó para la compra de la referida unidad, ofreciendo $154,500.00 y Caparra 5 mejoró la oferta.

31. El 23 de junio de 2020 se emitió la orden de confirmación de la venta judicial (*Order of Confirmation of Judicial Sale*) de la Oficina 803 a favor de Caparra 5.

32. La segunda subasta de la Oficina 804 se llevó a cabo el 26 de febrero de 2020 en el caso civil número KCD2009-1926 en el Tribunal de Primera Instancia. A dicha subasta compareció Caparra 5, por conducto de Nancy Lozada, quien licitó y adquirió de forma voluntaria la Oficina 804 por la suma de $155,000.00. Condado 3

licitó para la compra de la referida unidad, ofreciendo $154,500.00 y Caparra 5 mejoró la oferta.

33. El 16 de septiembre de 2020, se emitió la *Orden de confirmación de adjudicación o venta judicial* de la Oficina 804 a favor de Caparra 5.

34. Previo a las ventas judiciales de las Propiedades, Condado 3 se comunicó con la administración del Condominio Ashford Medical para indagar sobre la deuda por concepto de cuotas de mantenimiento de ambas propiedades.

35. Según el estado de cuenta con fecha de 31 de enero de 2020, las Propiedades le debían al Condominio Ashford Medical un total de $151,259.66 en cuotas de mantenimiento y derrama, entre otras deudas.

36. Condado 3 realizó oferta al Consejo Ashford por la suma de $95,000.00, la cual sería válida y pagadera únicamente si Condado 3 resultase el licitador victorioso y se le adjudicaran los inmuebles en pública subasta.

37. Según el contrato de administración del Condominio Ashford, Building Administration Management Serv. LLC (en adelante, "BAM"), representada por su presidente, Julio Quiles, acordó con el Consejo Ashford para ser la administradora del Condominio Ashford.

38. Julio Quiles, como empleado de BAM, administra el Condominio Ashford desde el año 2015.

39. Entre las funciones de Julio Quiles se encuentra: seguridad de la propiedad; preparar estados financieros; cuotas de mantenimiento; mantener áreas comunes en óptimas condiciones; supervisar los que dan vigilancia privada.

40. Condado 3, a través de su representante Midwest Servicing Inc. (en adelante, "Midwest"), se comunicó con Julio Quiles sobre la deuda de mantenimiento de las oficinas 8-3G y 8-4G.

41. Midwest le provee servicios a Condado 3, en este caso, de cobro de dinero, ejecución de sentencias y venta judicial.

42. Julio Quiles le prepara un informe de las deudas de cuotas de mantenimiento y otros asuntos a la Junta del Consejo Ashford Medical, los cuales se reúnen, aproximadamente 6 veces al año.

43. Omar Torres Lozada, en representación de Caparra 5, para el mes de diciembre de 2019 compareció al Condominio Ashford Medical, con el propósito de adquirir unas oficinas para arrendarle a Omar Torres Lozada en su carácter personal, para ejercer la práctica de la medicina.

44. Omar Torres Lozada se dirigió a las oficinas de administración donde el codemandado Julio Quiles le indicó que él era Administrador del Condominio Ashford Medical.

45. El codemandado Julio Quiles le brindó a Omar Torres Lozada información de cómo comunicarse con los inversionistas. Julio Quiles les brindó acceso a Omar Torres Lozada y a otras personas que lo acompañaban, a las oficinas 803 y 804 para que pudieran ver las oficinas.

Finalizado tal ejercicio fáctico, el foro primario consideró que no existía prohibición alguna que le impidiera atender la impugnación de los edictos, según solicitado, puesto que los requisitos dimanantes de los edictos federales no resultaban contradictorios respecto a los exigidos en el ámbito estatal. De este modo, concluyó que tenía jurisdicción para determinar la validez de los edictos en controversia.[5]

Dispuesto lo anterior, entonces el tribunal *a quo* procedió a determinar si los edictos de la subasta cumplieron con los requisitos legales. Con relación al edicto de subasta del caso KCD2009-1923, el foro apelado determinó que contenía la dirección física de la propiedad, la descripción de la hipoteca objeto de ejecución y todos los gravámenes posteriores a la hipoteca que se estaba ejecutando. En específico, el TPI identificó que del edicto surgía como gravámenes posteriores: (1) un aviso de demanda del caso KCD2009-1926 sobre cobro de dinero y ejecución; (2) tres embargos federales, y (3) la **sentencia del caso KCD2014-0081 (505)**.[6] (Énfasis provisto). Además, concluyó que el edicto cumplió con indicar que la propiedad se adquiría libre de cargas y gravámenes.

Igualmente, el foro primario señaló que el edicto para la subasta del **caso 18-CV-01377** ante el Tribunal Federal estableció en la sección de "*Junior Liens*" que en la Oficina 803 también se encontraba anotada la *Sentencia* emitida en el caso civil número KCD2014-0081.[7] De igual forma, concluyó que el edicto señalaba que la propiedad se adquiría libre de gravámenes.

---

[5] 12 USCA sec. 3706.

[6] SENTENCIA: En el Tribunal de Primera Instancia de San Juan, en el Caso Civil Número KCD2014-0081 (505), con fecha 10 de marzo del 2015 por Cobro de Dinero, seguido por Consejo de Titulares Condominio Ashford Medical Center, versus Titular Registral por la suma principal de $47,530.71, más costas, gastos e intereses, anotado el 29 de marzo del 2015 al folio 69, del libro de Sentencias Número 8. Anejo 12 del recurso de apelación, pág. 65.

[7] JUDGEMENT: Given at the First Instance Court, San Juan Branch, Civil Case No. KCD2014-0081 (505), dated March 10, 2015, of Collection of Monies, followed by Consejo de Titulares Condominio Ashford Medical Center v. Owner of this property, in the principal amount of $47,530.71, plus interests and costs, annotated on May 29, 2015, at page 69 of Judgement Books Number 8. Anejo 12 del recurso de apelación, pág. 69.

En virtud de lo anterior, el TPI determinó que al Caparra 5 adquirir los inmuebles mediante el procedimiento de subasta de la ejecución de hipoteca, estas propiedades se liberaron del gravamen de la Sentencia del caso KCD2014-081, como gravamen posterior o *junior liens.* Sin embargo, la referida eliminación a través de la Sentencia no suprimió la deuda por cuotas de mantenimiento de la propietaria anterior. Sobre esto último, el foro primario expuso que en nuestro ordenamiento jurídico la obligación de pagar las cuotas de mantenimiento bajo el régimen de propiedad horizontal subsiste bajo tales condiciones. Añadió el mismo foro que, al Caparra 5 adquirir las propiedades mediante subasta pública, surgía una presunción de que, como adquiriente voluntario, tenía la *oportunidad y los medios de enterarse de la deuda por los gastos comunes del condominio. Condominio First Federal v. LSREF2 Island Holdings LTD, Inc.*, 202 DPR 934, 944-945 (2019)*; Asociación de Condómines v. Naveira*, 106 DPR 88, 97 (1977).

Por el anterior razonamiento, el foro primario declaró *Ha Lugar* la *Solicitud de Sentencia Sumaria* instada por el Consejo de Titulares, y determinó que: (1) los edictos **cumplieron con los requisitos de ley**, y (2) Caparra 5 como adquiriente voluntaria mediante subasta responde por la deuda por cuotas de mantenimiento, conforme la *Ley de Condominios, infra.* Por otra parte, el TPI dispuso que permanecía en controversia la alegación referente a si el Consejo de Titulares, el señor Julio Quiles, Condado 3, el señor Ramírez de Arellado y SARLAW, LLC actuaron mediando fraude, treta y engaño al mantener silencio sobre las deudas de cuotas de mantenimiento para que Caparra 5 adquiriera las Propiedad, así como la cantidad adeudada por cuotas de mantenimiento. En atención a lo anterior, el foro primario ordenó la dilucidación de esta controversia mediante juicio plenario.

Inconforme, Caparra 5 presentó *Moción Solicitando Reconsideración y Solicitud de Determinaciones de Hechos Adicionales.* En específico, Caparra 5 solicitó que se añadieran las siguientes determinaciones de hechos:

4. De los siguientes hechos se desprenden, esencialmente del edicto y a su vez el incumplimiento con la Regla 51.8 de Procedimiento Civil y el Art. 102 de la Ley Núm. 210-2015 (30 LPRA 6139), en específico el párrafo 3 y el Art. 116. Es importante tener presente que según surge del edicto el término libre de cargas y gravámenes significa que el adquiriente no responde por el gravamen.

5. Condado 3, se comunicó con Julio Quiles sobre la deuda de mantenimiento de las oficinas 8-3G y 8-4G (Véase deposición de Ileana Payano, pág. 32), a través de su representante Midwest Servicing Inc. (en adelante Midwest) (Véase deposición Ileana Payano pág. 11 y pág. 27, línea 25).

6. La importancia de esta información solicitada a Julio Quiles por Midwest, era con el propósito de hacer un análisis y prepararse para las subastas y poder darle instrucciones al abogado que lleva el proceso de subasta. (Véase deposición de Ileana Payano, pág. 28).

7. Entre Midwest y Julio Quiles comenzaron las negociaciones para obtener una reducción en la deuda de mantenimiento. (Véase deposición de Ileana Payano, pág. 39).

8. Según Julio Quiles las facturas de la deuda de mantenimiento ya se habían estado enviando a la oficina del Lcdo. Ramírez. (Véase deposición de Julio Quiles, pág. 28, líneas 13-19; pág. 31 líneas-22-24; pág. 32, líneas 1-3; pág. 45.) Quiles había hecho un estudio bien extenso de toda la deuda de mantenimiento y preparó un documento con todas las deudas, cargas, penalidades de todo. (Véase deposición de Quiles, pág. 32, líneas 17-22; pág. 33, líneas 5-6; deposición Ileana Payano, pág. 33, líneas 3-6).

9. Cuando hay un condómino que adeuda cuotas de mantenimiento, Quiles es la persona que suspende los servicios (agua y luz) (Véase deposición de Quiles, Pág. 20, líneas 1-8) Quiles admite que ha visto a Omar Torres de Caparra 5, en dos ocasiones, él fue a la oficina de administración.

10. Uno de sus empleados lo encontró (Omar Torres Lozada), en el pasillo del piso 6, le informó que estaba interesado en comprar oficinas. Él estaba interesado en adquirir dos oficinas. Hay oficinas dobles y triples. Él estaba viendo las oficinas del Dr. Rappaport. El empleado le indica que si quiere tener más opciones que hable con Quiles en el piso 8 (Véase deposición de Quiles, pág. 21, líneas 1-10).

11. El Dr. Torres estaba viendo oficinas en el piso 6, cuyo dueño es el Dr. Rappaport, fue a la oficina de Quiles orientado por los empleados de Administración. Las oficinas son dos oficinas unidas de 600 pies cada una, propiedad del Dr. Rappaport.

12. La oficina del Dr. Rappaport tenía 1,200 pies porque tenía dos oficinas. Ricardo Rojas, empleado de Quiles, le indica que vaya a la oficina de administración. El Dr. Torres le explica sobre las oficinas de Rappaport. (Véase deposición de Quiles, pág. 23).

13. El Dr. Torres le indicó a Quiles que quería comprar una oficina doble. Las oficinas de Rappaport eran de 1,200 pies. Quiles lo orientó y le habló de las oficinas 8-3G y 8-4G. (Véase deposición de Quiles, pág. 24, líneas 21-25).

14. Quiles le mostró las oficinas y le habló sobre la deuda del CRIM y del Registro de la Propiedad. No le mencionó la deuda de mantenimiento. (Véase deposición de Quiles, pág. 25).

15. Quiles le dijo al Dr. Torres de las personas con los que se podía orientar. Le dio el número de la secretaria de Ramírez de Arellano. (Véase deposición de Quiles, pág. 26).

16. Quiles le envió la factura de mantenimiento a la oficina del Lcdo. Ramírez de Arellano. (Véase deposición de Quiles, pág. 28, líneas 15-19).

17. Quiles expone que sus funciones son: Seguridad de la propiedad; preparar estados financieros; cuotas de mantenimiento; mantener áreas comunes, específicamente en óptimas condiciones; supervisar los que dan vigilancia privada. (Véase deposición de Quiles, pág. 10, líneas 15-21).

18. Las gestiones de cobro las llevaba a cabo Julio Quiles por escrito con el Lcdo. Ramírez. (Véase deposición de Julio Quiles, pág. 28, líneas 3-19).

19. El edicto expone inequívocamente que el comprador no será responsable del pago de los junior liens. (Véase edicto federal).

20. Según Ramírez, el edicto contiene todos los términos de compra. (Véase deposición de Ramírez, pág. 25, líneas 8-13).

21. El Lcdo. Ramírez de Arellano declara que el comprador compra de acuerdo al contenido que surge del edicto y de haber alguna duda de los términos de la subasta, tendría que referirse al edicto. (Véase deposición de Ramírez pág. 25, líneas 8-13).

22. El edicto expone inequívocamente que el comprador no será responsable del pago de los gravámenes posteriores o junior liens al que está ejecutando. (Véase edicto estatal y federal).

23. La sentencia obtenida por el Consejo de Titulares en el caso K CD2014-0081, fue anotada posterior al crédito que Condado 3 se encontraba ejecutando. (Véase edicto estatal y federal).

24. En ambos casos (venta judicial estatal y federal) la persona que adquiría la propiedad en la subasta no venía obligada al pago de los gravámenes posteriores o junior liens. Lee el edicto que se adquieren libre de Gravámenes posteriores.

25. En la oficina de administración no hay un letrero ni aviso alguno que le advierta a los futuros adquirientes de propiedades en el Condominio que revisen el estado de deuda de cuotas de mantenimiento de las propiedades antes de comprar. (Véase deposición de Quiles, pág.43 líneas 10-13 y 18).

26. El co demandado Quiles no le indicó al Dr. Torres que las oficinas adeudaban por concepto de cuotas de mantenimiento. (Véase deposición de Omar Torres, pág. 44, líneas 3-19; pág. 46, líneas 7-10; pág. 49, líneas 9-13).

27. El co demandado Quiles no le informó al Dr. Torres y mantuvo silencio total, que las oficinas tenían una deuda por concepto de cuotas de mantenimiento y que de adquirir las mismas tendría que asumir el pago total de las mismas. (Véase deposición de Omar Torres, pág. 43, líneas 15-25).

28. El co demandado Quiles no le indicó al Dr. Torres, que debían verificar los balances de cuotas de mantenimiento que mantenían esos apartamentos. (Véase deposición de Omar Torres, pág. 44, líneas 3-19; pág. 46, líneas 7-10; pág. 49, líneas 9-13).

29. El co demandado Quiles tenía conocimiento de esta deuda, es decir, que las oficinas adeudaban por concepto de cuotas de mantenimiento. El co demandado Quiles preparaba las facturas a los condóminos y como parte de sus obligaciones se encargaba de cobrarlas. (Véase deposición de Quiles, pág. 32, líneas 1-25).

30. El estudio preparado por Quiles fue solicitado por Midwest para que estos pudieran hacer un análisis, prepararse para la subasta y darle instrucciones al abogado. De este estudio el Lcdo. Ramírez tenía conocimiento de la deuda de cuotas de mantenimiento. (Véase deposición Payano pág. 12, líneas 3-7 pág. 13, líneas 2-14).

31. El Dr. Torres se reunió con Quiles, Administrador del Condominio Ashford, en varias ocasiones y este le enseñó las oficinas 8-3G y 8-4G. (Véase deposición de Julio Quiles, pág. 20, líneas 1-8).

32. El co demandado Quiles tampoco le informó al Dr. Torres que el Condominio había llegado a un acuerdo con Condado 3. El Condominio acordó con Condado 3 que de adquirir las oficinas 8-3G y 8-4G reducirían la deuda de $151,259.66 a

$95,000.00. (Véase estipulación, y deposición de Quiles, pág. 32, líneas 1-25).

33. El contrato suscrito entre el Condominio y Condado 3, fue redactado en la oficina del Lcdo. Sergio Ramírez de Arellano. (Véase deposición Ileana Payano, pág. 43, líneas 9-23).

34. El Lcdo. Ramírez estuvo presente en las dos subastas. (Véase deposición de Ramírez, pág. 37, líneas 13-17). La primera subasta fue declarada desierta. (Véase deposición de Ramírez, pág. 27 líneas 1-25; pág. 29, líneas 24-25).

35. El Lcdo. Ramírez le indicó al Dr. Torres que su cliente se iba a llevar la propiedad en la segunda subasta, que iba a licitar en la segunda subasta. Esta aseveración resultó ser falsa. (Véase deposición de Ramírez, pág. 38, líneas 1-9).

36. Luego que Caparra 5 adquiere por subasta pública las oficinas y el Dr. Torres regresa a las oficinas de administración y le informa al co demandado Quiles que llevó a cabo la adquisición de las oficinas, es que Quiles le indica "siéntate allí que te tengo que informar que tienes que pagar las cuotas atrasadas por concepto de cuotas de mantenimiento" por la suma de por lo menos $151,259.66. Véase deposición de Quiles pág. 34 líneas 21-25, pág. 35, líneas 14-16 y 21-24; pág. 36, líneas 1-15).

37. El co demandado Quiles nunca le informó al Dr. Torres antes de la subasta pública que las oficinas adeudaban cuotas de mantenimiento. (Véase deposición de Quiles pág. 34 líneas 21-25, pág. 35, líneas 14-16 y 21-24; pág. 36, líneas 1-15).

38. Ramírez le explicó a Omar Torres, que los dueños de los créditos Condado 3, entienden que le pueden sacar más dinero a la venta de las oficinas a subastarse, si la trabajan "retail" o la venta privada de cada uno de los inmuebles. (Véase deposición de Omar Torres, pág. 57, líneas 7-25; pág. 58, líneas 1-18; pág. 119, líneas 4-25; pág. 120, líneas 1-6).

39. De haber adquirido las propiedades Condado 3 hubiese tenido que asumir la deuda de mantenimiento acordada con el Condominio el 11 de febrero de 2020, por $95,000.00 pagadera 10 días de haberse celebrado la subasta. (Véase estipulación).

40. El co demandado Ramírez de Arellano, ni el co demandado Quiles, le indicaron al Dr. Torres que tenía que asumir el pago de las cuotas de mantenimiento que pesaba sobre las oficinas 8-3G y 8-4G, que ascendían a la suma aproximada de $151,259.66, si obtenían las mismas en la subasta. (Véase deposición de Omar Torres, pág. 76, líneas 3-14; pág. 77, líneas 1-25, pág. 78, líneas 1-18).

41. La parte co demandada Ramírez de Arellano, no incluyó en el edicto de las subastas la suma de la deuda por cuotas de mantenimiento, porque es un gravamen preferente y en

este caso, ya había una sentencia registrada y era menester de cualquier licitador ver esa sentencia del 2015. (Véase deposición de Ramírez pág. 31, líneas 12-16) En ninguna de las dos subastas estaba la deuda de mantenimiento, pero si estaba anotada la sentencia por la deuda de mantenimiento del Consejo de Titulares del Condominio Ashford. (Véase deposición Ramírez, pág. 32, líneas 1-5). Todo lo contrario, del edicto surge que la deuda de mantenimiento es una que de adquirir el inmueble en el procedimiento de subasta al ser un junior liens o gravamen posterior, el comprador adquiría sin tener que satisfacer esta deuda.

42. Tampoco Ramírez le informó al Dr. Torres cuando se reunió con él información sobre la deuda de mantenimiento. (Véase deposición de Ramírez pág. 31, líneas 12-16; pág. 32, líneas 1-5).

43. Ramírez de Arellano mantuvo silencio al no informarle al Dr. Torres la deuda por cuotas de mantenimiento. (Véase deposición de Ramírez, pág. 37, líneas 7- 12 y 20- 25).

44. El co demandado Ramírez de Arellano le informó que no iban a llevar a cabo una tercera subasta por que le sacaba más dinero vendiéndola en "retail" las oficinas 8-4G y 8-3G. (Véase deposición de Omar Torres, pág. 76, líneas 3-14; pág. 77, líneas 1-25, pág. 78, líneas 1-18; pág. 119, líneas 4-25; pág. 120, líneas 1-6).

45. El edicto sólo indica que las propiedades se adquieren libres de cargas y gravámenes posteriores a la hipoteca que es objeto de subasta. (Véase edictos; deposición de Ramírez pág. 42 líneas 23-24, pág. 43 líneas 1-7). En las cargas posteriores está la Sentencia del Consejo de Titulares. (KCD2014-0081) (Véase edicto).

46. En el edicto federal la sentencia del Consejo de Titulares está identificada como un *junior liens.* (Véase deposición de Ramírez, pág. 44, líneas 8-9). El que adquiere, adquiere sin tener que pagar los gravámenes posteriores y los *junior liens.* (Véase deposición Ramírez, pág. 45, líneas 3- 5). En inglés son *junior liens,* en español gravámenes posteriores. (Véase deposición de Ramírez, pág. 44, líneas 1- 25)

47. La Sentencia anotada en el Registro de la Propiedad por el Consejo de Titulares el 29 de marzo de 2015 al folio 69 del libro de Sentencias Número 8, es un gravamen presentado posterior a la hipoteca que se está ejecutando. Según dispone el edicto, el comprador en la subasta no responde por la deuda contenida en la sentencia, por ser un gravamen posterior. (Véase edicto).

48. La segunda subasta de la oficina 8-3G se llevó a cabo en el Tribunal Federal Distrito de San Juan, el 20 de febrero de 2020, por la suma de $155,500.00. (Véase edicto federal).

No obstante, el TPI emitió *Resolución* declarando No Ha Lugar la *Moción Solicitando Reconsideración y Solicitud de Determinaciones de Hechos Adicionales.* Al así decidir el foro primario explicó que los hechos propuestos *no alteran sustancialmente los hechos, de manera que provoque una variación en nuestra determinación y/o van dirigidos a establecer hechos sobre los cuales el Tribunal no dictó sentencia sumaria y ordenó la continuación de los procedimientos.*[8]

Insatisfecho aun, Caparra 5 acudió ante nosotros mediante recurso de apelación, señalando la comisión de los siguientes errores:

> ERRÓ EL TPI EN NO ADOPTAR LAS DETERMINACIONES DE HECHOS ADICIONALES PROPUESTAS POR EL APELANTE. ESTOS HECHOS ESTÁN RESPALDADOS POR EVIDENCIA DOCUMENTAL O TESTIFICAL QUE LOS SOSTIENE.

> ERRÓ EL TPI EN NO DETERMINAR QUE EL EDICTO PUBLICADO EN EL PROCEDIMIENTO DE EJECUCIÓN DE SENTENCIA CONTENIDO EN EL CASO CIVIL CONDADO 2 CR2, LLC V, FRANCES FRANCESCHI NAZARIO, K CD2009-1926, PRODUJO LA NULIDAD DE LA SUBASTA.

> ERRÓ EL TPI EN NO DETERMINAR QUE EL EDICTO PUBLICADO EN EL PROCEDIMIENTO DE EJECUCIÓN DE SENTENCIA Y CONTENIDO EN EL CASO CONDADO 3 CR2, LLC V. FRAMCES FRANCESCHI NAZARIO, 18-CV-01377 (DRD) PRODUJO LA NULIDAD DE LA SUBASTA.

En respuesta, tanto Condado 3, Sergio A. Ramírez de Arellano, como SARLAW, LLC presentaron alegatos en oposición a recurso de apelación.

Examinados los escritos sometidos por las partes y los documentos que obran en el expediente, estamos en posición de resolver.

## II. Exposición de Derecho

### A. La Moción de Sentencia Sumaria

El propósito de las Reglas de Procedimiento Civil es proveer a las partes que acuden a un tribunal una "solución justa, rápida y económica de todo procedimiento". 32 LPRA Ap. V, R.1; *González Santiago v. Baxter*

---

[8] Anejo 26 del recurso de apelación, pág. 560.

*Healthcare,* 202 DPR 281, 290 (2019); *Roldan Flores v. M. Cuebas et al.,* 199 DPR 664, 676 (2018); *Rodríguez Méndez et al. v. Laser Eye,* 195 DPR 769, 785 (2016), *Oriental Bank v. Perapi et al.,* 192 DPR 7, 25 (2014). La sentencia sumaria hace viable este objetivo al ser un mecanismo procesal que le permite al tribunal dictar sentencia sobre la totalidad de una reclamación, o cualquier controversia comprendida en ésta, sin la necesidad de celebrar una vista evidenciaria. J. A. Echevarría Vargas, *Procedimiento Civil Puertorriqueño*, 1era ed., Colombia, 2012, pág. 218. Procede dictar sentencia sumaria si "las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas y alguna otra evidencia si las hubiere, acreditan la inexistencia de una controversia real y sustancial respecto a algún hecho esencial y pertinente y, además, si el derecho aplicable así lo justifica". *González Santiago v. Baxter Healthcare,* supra*; Roldan Flores v. M. Cuebas et al.,* supra; *Lugo Montalvo v. Sol Meliá Vacation,* 194 DPR 209, 225 (2015), *SLG Zapata-Rivera v. J. F. Montalvo,* 189 DPR 414, 430 (2013). A su vez se recomienda, en aquellos casos en que el tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia. *Mejías et al. v. Carrasquillo et al.,* 185 DPR 288, 299 (2012).

Por el contrario, no es "aconsejable utilizar la moción de sentencia sumaria en casos en donde existe controversia sobre elementos subjetivos, de intención, propósitos mentales o negligencia, o cuando el factor credibilidad es esencial y está en disputa". *Ramos Pérez v. Univisión,* 178 DPR 200, 219 (2010). Este mecanismo está disponible para la disposición de reclamaciones que contengan elementos subjetivos únicamente cuando no existan controversias de hechos esenciales y pertinentes. *Rodríguez García v. UCA,* 200 DPR 929, 940 (2018), *Velázquez Ortiz v. Mun. De Humacao,* 197 DPR 656, 661 (2017);

*Reyes Sánchez v. Eaton Electrical,* 189 DPR 586, 594-595 (2013); *Const. José Carro v. Mun. de Dorado*, 186 DPR 113, 129 (2012); *Ramos Pérez v. Univisión*, supra; *Abrams Rivera v. ELA*, 178 DPR 914, 933 (2010).

Así, la sentencia sumaria "vela adecuadamente por el balance entre el derecho de todo litigante a tener su día en corte y la disposición justa rápida y económica de los litigios civiles". *Const. José Carro v. Mun. de Dorado*, supra, en la pág. 130; *Mejías et al. v. Carrasquillo et al.,* supra, en la pág. 300; *Ramos Pérez v. Univisión*, supra, a la pág. 220. Por lo tanto, el principio rector que debe guiar al juez de instancia en la determinación sobre si procede o no la sentencia sumaria es "el sabio discernimiento", ya que si se utiliza de manera inadecuada puede prestarse para privar a un litigante de su día en corte, lo que sería una violación a su debido proceso de ley. *Mun. de Añasco v. ASES et al.*, 188 DPR 307, 327-328 (2013). Ello, pues la mera existencia de "una controversia de hecho es suficiente para derrotar una moción de sentencia sumaria ... cuando causa en el tribunal una duda real y sustancial sobre algún hecho relevante y pertinente". *Pepsi-Cola v. Mun. Cidra et al.,* 186 DPR 713, 756 (2012). Se considera un hecho esencial y pertinente, aquél que puede afectar el resultado de la reclamación acorde al derecho sustantivo aplicable. *Ramos Pérez v. Univisión*, supra, pág. 213.

**B. Función revisora del foro apelativo con respecto a la sentencia dictada por el foro primario**

En el caso de revisar sentencias del Tribunal de Primera Instancia dictadas mediante el mecanismo de sentencias sumarias o resolución que deniega su aplicación, nuestro Tribunal de Apelaciones se encuentra en la misma posición que el tribunal inferior para evaluar su procedencia. *Meléndez González et al. v. M. Cuebas*, 193 DPR 100 (2015). Los criterios a seguir por este foro intermedio al atender la revisión de una sentencia sumaria dictada por el foro primario han sido enumerados

con exactitud por nuestro Tribunal Supremo. *Íd.* A tenor, el Tribunal de Apelaciones debe:

1. examinar de *novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario;

2. revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*;

3. revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos;

4. y de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar de *novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.

Además, al revisar la determinación del TPI respecto a una sentencia sumaria, estamos limitados de dos maneras; (1) solo podemos considerar los documentos que se presentaron ante el foro de primera instancia, (2) solo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. *Meléndez González, et al. v. M. Cuebas*, supra. El primer punto se enfoca en que las partes que recurren a un foro apelativo no pueden litigar asuntos que no fueron traídos a la atención del foro de instancia. Mientras que el segundo limita la facultad del foro apelativo a revisar si en el caso ante su consideración existen controversias reales en cuanto a los hechos materiales, pero no puede adjudicarlos. *Íd.* en la pág. 115. También, se ha aclarado que al foro apelativo le es vedado adjudicar los hechos materiales esenciales en disputa, porque dicha tarea le corresponde al foro de primera instancia. *Vera v. Bravo*, 161 DPR 308, 335 (2004).

## C. Moción de Reconsideración y Determinaciones de Hechos Adicionales

La Regla 43.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 43.1, exige que si una parte interesa solicitar reconsideración y determinaciones de hechos adicionales, debe acumular ambas solicitudes en la misma petición para que el tribunal resuelva ambos asuntos en una sola resolución. *Morales y otros v. The Sheraton Corp.*, 191 DPR 1, 9 (2014). En específico, la referida regla dispone lo siguiente:

> [n]o será necesario solicitar que se consignen determinaciones de hechos a los efectos de una apelación, pero a moción de parte, presentada a más tardar quince (15) días después de haberse archivado en autos copia de la notificación de la sentencia, el tribunal podrá hacer las determinaciones de hechos y conclusiones de derecho iniciales correspondientes si éstas no se hubiesen hecho por ser innecesarias, de acuerdo con la Regla 42.2, podrá enmendar o hacer determinaciones adicionales o podrá enmendar la sentencia en conformidad. Si una parte interesa presentar una moción de enmiendas o determinaciones iniciales o adicionales, reconsideración o de nuevo juicio, éstas deberán presentarse en un solo escrito y el tribunal resolverá de igual manera. [...]. Regla 43.1 de Procedimiento Civil, *supra.*

El propósito de esta regla es "evitar que las partes presenten escritos separadamente con miras a, entre otros motivos, suspender los términos." *Berríos Fernández v. Vázquez Botet*, 196 DPR 245, 253 (2016).

Es norma reiterada que la adjudicación de una moción de reconsideración y de una solicitud de determinaciones de hechos adicionales es de gran envergadura al derecho de un debido proceso de ley, pues esta incide sobre los términos para acudir en alzada. *Íd.* En cuanto a la adjudicación del juzgador de hechos sobre estas mociones postsentencia, la aludida Regla 43.1 de Procedimiento Civil, *supra*, establece que:

> [n]o será necesario solicitar que se consignen determinaciones de hechos a los efectos de una apelación, pero a moción de parte, presentada a más tardar quince (15) días después de haberse archivado en autos copia de la notificación de la sentencia, el tribunal **podrá** hacer las determinaciones de hechos y conclusiones de derecho iniciales correspondientes si éstas no se hubiesen hecho por ser innecesarias, de acuerdo con la Regla

42.2, **podrá** enmendar o hacer determinaciones adicionales o podrá enmendar la sentencia en conformidad. (Énfasis provisto).

De la letra de la citada disposición reglamentaria resulta a la vista que el foro primario **no está obligado a emitir determinaciones de hechos y de derecho adicionales**, luego de solicitada, por una parte, **si no proceden.** *Blás v. Hosp. Guadalupe,* 146 DPR 267, 319 (1998) (Énfasis nuestro). Sobre ello, el Tribunal Supremo ha dispuesto lo siguiente:

> **[l]a utilización de la palabra "podrá" le imparte un carácter discrecional para que el juez determine si las mismas proceden o no.** En vista de ello, aplicamos el canon de hermenéutica consignado en la Sección 14 de nuestro Código Civil, 31 LPRA sec. 14, a los efectos de que cuando "...la ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". *Blás v. Hosp. Guadalupe,* supra, pág. 319. (Énfasis provisto).

**De ordinario, un tribunal apelativo no debe intervenir con las decisiones discrecionales de los foros primarios, salvo que se demuestre que hubo un craso abuso de discreción**. *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414 (2013). (Énfasis nuestro). "El propósito de esa regla consiste en que los foros apelativos no deben pretender administrar ni manejar el trámite regular de los casos ante el foro primario." *Íd.* A pesar de que el ejercicio de determinar cuando el tribunal ha abusado de su discreción no es tarea fácil, no tenemos duda que el adecuado ejercicio de discreción descansa en un juicio de razonabilidad judicial para llegar a una conclusión justiciera. *Rivera y otros v. Bco. Popular,* 152 DPR 140, 155 (2000).

### D. Edicto de subasta

La Ley del Registro de la propiedad indica que *una vez se declare con lugar la demanda y advenga final y firme la sentencia dictada en el procedimiento de ejecución de hipoteca, el tribunal ordenará, a instancia del ejecutante, la expedición del correspondiente mandamiento, para que*

*el alguacil proceda a la subasta de los bienes hipotecados.* Artículo 99, 30 LPRA sec. 6136. Previo a la referida subasta, es requisito que se publique un edicto anunciando la misma conforme a lo establecido en las Reglas de Procedimiento Civil. *Íd.* Nuestro Alto Foro ha reiterado que la publicación de los avisos de venta con anterioridad a la celebración de la subasta en venta judicial es un requisito fundamental íntimamente ligado al debido proceso de ley. *Lincoln Savs. Bank v. Figueroa,* 124 DPR 388, 391 (1989). Sobre el particular, las Reglas de Procedimiento Civil en su Artículo 51.7, 32 LPRA Ap. V, 51.7, regula el procedimiento de las ventas judiciales. En lo pertinente, la aludida regla dispone que el aviso de venta debe cumplir con lo siguiente:

(a) *Aviso de venta.* Antes de verificarse la venta de los bienes objeto de la ejecución, ésta deberá darse a la publicidad por espacio de dos (2) semanas mediante avisos por escrito visiblemente colocados en tres (3) sitios públicos del municipio en que ha de celebrarse dicha venta, tales como la alcaldía, el tribunal y la colecturía.

Dicho aviso será publicado, además, mediante edictos dos (2) veces en un diario de circulación general en el Estado Libre Asociado de Puerto Rico, y por espacio de dos (2) semanas consecutivas, con un intervalo de por lo menos siete días entre ambas publicaciones. Copia del aviso será enviada al deudor o deudora por sentencia y a su abogado o abogada vía correo certificado con acuse dentro de los primeros cinco (5) días de publicado el primer edicto, siempre que haya comparecido al pleito. Si el deudor o la deudora por sentencia no comparece al pleito, la notificación será enviada vía correo certificado con acuse a la última dirección conocida.

En todos los casos en que se plantee que la parte promovente de un procedimiento de ejecución de sentencia no ha cumplido con alguno de los requisitos de esta regla, el tribunal, a solicitud de parte, celebrará una vista para resolver la controversia planteada. El aviso de venta describirá adecuadamente los bienes que se venderán y hará referencia sucintamente, además, a la sentencia que se satisfará mediante dicha venta, con expresión del sitio, el día y la hora en que se celebrará la venta. Si los bienes son susceptibles de deterioro, el tribunal, a solicitud de parte, podrá reducir el término de publicación del aviso a menos de dos (2) semanas. Será nula toda venta judicial que se realice sin cumplir con el aviso de venta en la forma indicada, sin perjuicio de la responsabilidad de la parte que promueva la venta sin cumplir con tal aviso.

Por su parte, el Artículo 102 de la Ley Hipotecaria, 30 LPRA sec. 6139, establece cuál debe ser el contenido del edicto. En específico, indica que el edicto debe exponer lo siguiente:

1. Que los autos y todos los documentos correspondientes al procedimiento incoado estarán manifiesto en la secretaría del tribunal durante las horas laborables.
2. Que se entenderá que todo licitador acepta como bastante la titularidad y que las cargas y gravámenes anteriores y los preferentes, si los hubiere, al crédito del ejecutante continuarán subsistentes. Se entenderá, que el rematante los acepta y queda subrogado en la responsabilidad de los mismos, sin destinarse a su extinción el precio del remate.
3. La suma de cada carga anterior o preferente, el nombre o nombres de sus titulares y fecha o fechas de vencimiento.
4. La descripción de los bienes o derechos reales objeto de subasta, el precio mínimo del remate y los restantes detalles complementarios sobre la subasta, tales como el día, hora y sitio en que se efectuará el remate.
5. Todos los nombres de los acreedores que tengan inscritos o anotados sus derechos sobre los bienes hipotecados con posterioridad a la inscripción del crédito del ejecutante, o de los acreedores de cargas o derechos reales que los hubiesen pospuesto a la hipoteca ejecutada y las personas interesadas en, o con derecho a exigir el cumplimiento de instrumentos negociables garantizados hipotecariamente con posterioridad al crédito ejecutado, para que puedan concurrir a la subasta si les convenga o satisfacer antes del remate el importe del crédito, de sus intereses, costas y honorarios de abogados asegurados, quedando entonces subrogados en los derechos del acreedor ejecutante.
6. Se expresará que la propiedad a ser ejecutada se adquirirá libre de cargas y gravámenes posteriores.
   *Íd.*

Conforme a lo anterior, el Artículo 103 de la Ley del Registro de la Propiedad, 30 LPRA sec. 6140, precisa que:

Las normas, requisitos, condiciones y términos referentes a la subasta, expresados en la orden de subasta o en el edicto, **obligarán y afectarán categóricamente a todas las partes en el procedimiento hipotecario**, incluyendo acreedores posteriores, licitadores, interventores, adjudicatarios, compradores, adquirientes y rematantes en la subasta y sus sucesores o causahabitantes. (Énfasis nuestro).

Sin embargo, el Tribunal Supremo ha establecido que la falta de notificación a acreedores posteriores, errores en la fecha de subasta, insuficiente publicación o deficiente descripción de la propiedad a

realizarse son algunas de las omisiones que constituyen defectos fundamentales en el edicto de subasta. *Dapena Quiñonez v. Vda. Del Valle,* 109 DOR 138, 141 (1979*). Tales vicios o defectos sustanciales, inextricablemente ligados al debido proceso de ley, niegan validez jurídica al edicto, independientemente de que se demuestre perjuicio a alguna parte. Íd.,* en las págs. 141-142.

Asimismo, la Ley Hipotecaria indica que tanto el acreedor ejecutante, el deudor, el tercer poseedor o cualquier postor pueden objetar por escrito el procedimiento de subasta. Artículo 105, 30 LPRA sec. 6142. A tenor, el Artículo 107 de la referida ley, una vez celebrada la subasta, el alguacil devolverá a la Secretaría del Tribunal el mandamiento y el acta junto con el edicto y demás documentos relativos a la subasta, incluyendo cualquier objeción al procedimiento. 30 LPRA sec. 6144. Luego, el Tribunal examinará todo el expediente del procedimiento para cerciorarse de que en todos los trámites del procedimiento se cumplieron debidamente con los requisitos, y así lo determinarlo. *Íd.* Empero, si el Tribunal concluye que no se cumplió, en todo o en parte, con los requisitos dispuestos en la ley, entonces:

> expondrá las razones en que se funda, y ordenará se corrijan los errores, faltas o defectos que haya observado, y que se practiquen debidamente las diligencias o actuaciones incorrectas que surjan del expediente. Podrá ordenar además al deudor o tercer poseedor que no pague cualquier cuantía que se le haya requerido pagar en exceso de las debidas o que no esté cubierta por la garantía hipotecaria. Una vez corregidos o subsanados esos errores, faltas o defectos en la forma ordenada, el tribunal confirmará la adjudicación o venta. El acreedor hipotecario podrá tramitar un nuevo procedimiento de ejecución con arreglo a lo dispuesto en este subtítulo cuando la venta no sea confirmada por error en el procedimiento o cualquiera otra razón determinada por el tribunal.
> 　　　Si el tribunal finalmente no confirma la adjudicación o venta, quedará la misma sin efecto ni valor jurídico alguno, devolviéndose el precio pagado al comprador.
> *Íd.*

Además, el Artículo 116 de la Ley del Registro de la Propiedad, dispone que *la cancelación de los asientos posteriores al crédito ejecutado,*

*se hará a instancia del que resulte dueño de la finca o derecho, presentando orden y mandamiento emitidos por el tribunal correspondiente. Dicha orden expresará con particularidad los asientos a ser cancelados. Esta cancelación será libre de derechos. Las hipotecas y demás gravámenes preferentes al crédito del ejecutante, continuarán subsistentes y sin cancelar.* 30 LPRA sec. 6143.

### E. Adquiriente voluntario

Desde la aprobación de la Ley de Condominios del 1958, se estableció la obligación de cada titular al pago de los gastos comunes o cuotas de mantenimiento como uno de los principios esenciales de la vida en comunidad. *Condominio First Federal Savings v. LSREF2 Island Holdings LTD.,* supra en la pág. 940. Asimismo, se instituyó que del titular transmitir la propiedad, éste y el adquiriente tendrían la responsabilidad solidaria del pago de las cuotas de mantenimiento impagadas. *Íd.,* págs. 940-941.

Posteriormente, el Artículo 41 de la Ley de Condominios fue enmendado y se clasificó como adquiriente voluntario al obligado a responder solidariamente con el transmitente del pago de las cuotas de mantenimiento. *Íd.,* pág. 941. Entonces, en *Asociación de Condómines v. Naveira,* 106 DPR 88 (1977), el Alto Foro realizó un análisis minucioso del adquiriente voluntario y, por primera vez, incorporó a nuestro derecho puertorriqueño la figura del adquiriente involuntario. Allí, entre otras cosas, el Tribunal Supremo reiteró que la enmienda al Art. 41, *supra,* ciertamente fortalecía la responsabilidad solidaria entre el condómine deudor y el adquiriente del apartamiento. En esencia, **resolvió que un particular que concurra en una subasta pública con el acreedor que ejecuta y en la pública subasta se lleva la buena pro es un adquiriente voluntario, por lo que responde solidariamente del total de las cuotas de mantenimiento impagadas por el deudor**.

*Asociación de Condómines v. Naveira,* supra en la pág. 96. (Énfasis nuestro).

Además, el Alto Foro determinó que un comprador, un donatario, un permutante o un licitador que se lleva la buena pro en la subasta es un adquiriente voluntario. *Condominio First Federal Savings v. LSREF2 Island Holdings LTD,* supra en la pág. 943; *Asociación de Condómines v. Naveira,* supra. En contraparte, definió que un adquiriente involuntario, son *aquellos que advienen dueños del apartamiento al ejercer los créditos preferentes* del Art. 40 de la Ley de Condominios, 31 LPRA sec. 1293d. *Íd.* Es decir, (1) el estado, (2) las aseguradoras y (3) los créditos hipotecarios. *Íd; Asociación de Condómines v. Naveira,* supra en la pág. 97.

Por otro lado, el Tribunal Sumpro señaló que el adquiriente voluntario es un comprador que bien informado de los gravámenes y cargas del apartamiento, lo adquiere porque es un buen negocio, tiene oportunidad y medios de enterarse de la deuda por gastos comunes del condominio y poder de decisión para asumirlos como gravamen del inmueble que adquiere. *Condominio First Federal Savings v. LSREF2 Island Holdings LTD,* supra en las págs. 943-944.

En lo que se referie a la obligación del pago de las cuotas de mantenimiento, el Artículo 39 de la Ley de Condominios, establece que:

> Los titulares de los apartamientos están obligados a contribuir proporcionalmente a los gastos para la administración, conservación y reparación de los elementos comunes generales del inmueble y, en su caso, de los elementos comunes limitados, así como a cuantos más fueren legítimamente acordados.
>
> En aquellos casos donde un condominio comparta el uso de áreas o instalaciones de acceso, seguridad, recreativas, educativas, de servicios o de otro tipo para que sus titulares y residentes las usen en común con otros condominios, urbanizaciones y/u otros proyectos o áreas de desarrollo, el Consejo de Titulares del referido condominio contribuirá a los gastos de operación, mantenimiento, seguridad, reparación, pago de utilidades y servicios, seguros y otros relacionadas con dichas áreas e instalaciones, según las

disposiciones que se establezcan para ello en la escritura matriz del condominio, o en aquellas escrituras de convenios maestros, servidumbres en equidad u otros documentos constitutivos de condiciones restrictivas y/o servidumbres, que se otorguen en relación con los distintos terrenos y/o proyectos sobre los cuales se impongan dichas condiciones, restricciones, convenios y/o servidumbres, y/o sobre aquellos que usen dichas áreas y/o instalaciones en forma compartida.
31 LPRA sec. 1293c.

Por su parte el artículo 40 de la Ley de Condominios, dispone unas excepciones a la preferencia del cobro de la deuda de mantenimiento del Consejo de Titulares. En específico, establece:

El crédito contra cualquier titular por su parte en los gastos a que se refiere el Artículo 39 de esta ley tendrá preferencia sobre cualquier otro crédito de cualquier naturaleza excepto los siguientes:
(a) Los créditos a favor del Estado Libre Asociado y la correspondiente municipalidad por el importe de las cinco (5) últimas anualidades y la corriente no pagada, vencidas y no satisfechas de las contribuciones que graviten sobre el apartamiento.
(b) Por la prima del seguro de dos (2) años, del apartamiento o del inmueble total, en su caso, y si fuese el seguro mutuo por los dos (2) últimos dividendos que se hubiesen repartido.
(c) Los créditos hipotecarios inscritos en el Registro de la Propiedad. 31 LPRA sec. 1293d.

Es decir, Ley de Condominio determina que el crédito contra cualquier titular –por su parte en el pago de las cuotas de mantenimiento por los gastos comunes– tendrá preferencia sobre cualquier otro crédito de cualquier naturaleza excepto, entre otros, los créditos hipotecarios inscritos en el registro de la propiedad. *Íd.*

Por otro lado, el Art. 41 de la Ley de Condominios, 31 LPRA sec. 1293e, esblacele lo relacionado a la obligación por gastos comunes. En esencia, indica que:

La obligación del titular de un apartamento por su parte proporcional de los gastos comunes constituirá un gravamen sobre dicho apartamento, una vez anotado en el Registro de la Propiedad. Por lo tanto, luego de la primera venta, el adquirente voluntario de un apartamento será solidariamente responsable con el transmitente del pago de las sumas que éste adeude, a tenor con el Artículo 39 de esta Ley, hasta el momento de la transmisión, sin perjuicio del derecho del adquirente a repetir contra el otro otorgante, por las cantidades que hubiese pagado como deudor solidario.

> Sin embargo, un adquirente involuntario será responsable solamente de las deudas por gastos comunes surgidas y no satisfechas durante los seis meses anteriores al momento de adquirir la propiedad en adición al balance corriente que se acumule desde la adquisición de dicho inmueble por parte del adquiriente involuntario. Para efectos de lo anterior, es adquiriente involuntario el acreedor hipotecario que en cobro de su crédito adquiere un inmueble sujeto a esta Ley, el cual pagará mensualmente o en el término establecido por el Consejo de Titulares.
> [...]
> *Íd.*

A saber, le impone responsabilidad solidaria a quien adquiere un apartamiento, el cual junto con el transmitente deberá responder por el pago de las cuotas atrasadas al momento del traspaso de titularidad. *Coop. Oriental v. Const. Tit. y otros,* 195 DPR 330, 341 (2016). La importancia de la distinción entre el adquiriente voluntario y el involuntario, en lo que atañe al pago de las cuotas de mantenimiento adecuadas, radica en que, si se tratase del primero, la responsabilidad solidaria abarca la totalidad de la cuantía debida por el transmitente. *Íd.* En cambio, en el caso de un adquiriente involuntario, dicha responsabilidad solidaria se limita a las deudas por gastos comunes que hayan surgido durante los seis meses anteriores al momento de adquirir la propiedad. *Íd.*

**III.  Aplicación del Derecho a los hechos**

a.

Como se ha visto, en su primer señalamiento de error Caparra 5 sostiene que incidió el TPI al no adoptar las determinaciones de hechos adicionales que propuso en la moción que instó a esos efectos, a pesar de no haber sido controvertidos por los apelados. A tenor, afirma que tales determinaciones de hechos adicionales debieron haber sido incluidas entre los hechos incontrovertidos, en tanto estuvieron debidamente respaldados por la evidencia documental con la que fue acompañada su moción dispositiva. Con mayor especificidad, esta parte propuso cincuenta y una determinaciones de hechos adicionales porque:

(1) recogen admisiones del señor Julio Quiles y del señor Ramírez de Arellano, representantes de Condado 3 y del Consejo de Titulares; (2) la causa de acción no resuelve que los apelados cometieron dolo y no divulgaron información; (3) queda pendiente por determinar que el Consejo de Titulares, Condado 3, el señor Ramírez de Arellano, SARLAW, LLC y el señor Julio Quiles le son responsables a Caparra 5; y (4) comprenden el contenido total del edicto.

En contraposición, Condado 3 esgrime que las determinaciones adicionales solicitadas por el apelante no alterarían de manera alguna la *Sentencia Parcial* apelada. Por el contrario, sostiene que a través de su solicitud Caparra 5 pretende que se establezcan hechos que precisamente el foro primario juzgó persistían en controversia y merecían ser dilucidados en juicio plenario.

Por su parte, el señor Ramírez de Arellano y SARLAW, LLC. esgrimen que, el TPI puede incorporar determinaciones de hechos adicionales para corregir o enmendar una sentencia, pero no está obligado a ello. Además, a tono con la posición de Condado 3, aseveran que la mayoría de los hechos propuestos por la apelante están relacionados a la controversia sobre el alegado dolo y la no divulgación de la deuda por cuotas de mantenimiento, alegaciones sobre hechos que se mantienen en controversia y fueron expresamente reservados para ser dilucidados en el juicio. En lo relativo a los edictos de subasta argumentan que los escasos hechos propuestos por Caparra 5 a estos efectos, exponen cuestiones que van al contenido textual de dichos edictos, lo cual fue examinado y considerado por el TPI.

b.

No hay duda de que, ante una solicitud de hechos adicionales, por virtud de la Regla 43.1 de Procedimiento Civil, *supra,* el foro primario **podrá** enmendar la sentencia a fines de acoger las determinaciones de

hechos adicionales que estime procedan. Sin embargo, tal como lo subrayamos en la exposición de derecho, el vocablo **podrá** en este contexto provee un espacio discrecional al TPI para que determine si admite o no las determinaciones de hechos adicionales propuestas, pero no está obligado a ello si juzgara que no proceden, como tampoco se le impone explicar su determinación a tales efectos. *Blás v. Hosp. Guadalupe,* supra. En definitiva, el foro apelado no estaba obligado a acoger las determinaciones de hecho adicionales sugeridas por el apelante, ni a explicar su denegatoria a ello.

Entonces, al integrar lo dicho a nuestra función revisora, debemos destacar que este foro intermedio no debe intervenir con las decisiones discrecionales de los foros primarios, salvo que se demuestre que hubo un craso abuso de discreción. *SLG Zapata-Rivera v. J.F. Montalvo,* supra. No apreciamos en la denegatoria del tribunal apelado para incorporar los hechos adicionales sugeridos, el abuso de discreción que justificaría nuestra intervención. Además, aunque estamos en igual posición que el TPI para valorar la prueba documental en la que se basó el apelante para solicitar la inclusión de hechos adicionales, tampoco nos persuade de ello.

Lo cierto es que, examinadas las adiciones fácticas propuestas por el apelante, estamos convencidos que en su gran mayoría aluden o se relacionan con hechos cuya mejor disposición acontecerá a través de la celebración del juicio. En particular, nos referimos a aquellos hechos que inciden sobre la determinación a ser dilucidada de si en este caso intervino fraude, treta o engaño por el Consejo de Titulares, el señor Julio Quiles, Condado 3, el señor Ramírez de Arellano y SARLAW, LLC. al presuntamente ocultar o mantener silencio sobre una información importante en la decisión de Caparra 5 sobre la compra de los inmuebles, la relacionada a las deudas de cuotas de mantenimiento. Es

precisamente por asuntos de esta índole que nuestro Tribunal Supremo ha advertido que no es aconsejable utilizar la moción de sentencia sumaria en casos en donde existe controversia sobre **elementos subjetivos**, **de intención, propósitos mentales o negligencia**, o **cuando el factor de credibilidad es esencial y está en disputa**. *Ramos Pérez v. Univisión,* 178 DPR 200, 219 (2010). (Énfasis nuestro). A lo que el mismo alto Foro añade, que se podrá utilizar el mecanismo de sentencia sumaria en reclamaciones que contengan elementos subjetivos únicamente **cuando no existan controversias de hechos esenciales y pertinentes**. *Rodríguez García v. UCA,* 200 DPR 929 (2018); *Velázquez Ortiz v. Mun. De Humacao,* 197 DPR 656, 662 (2017). (Énfasis provisto). Acertó el foro primario al considerar que las controversias que quedan por dilucidar están imbuidas de ese carácter subjetivo cuya dilucidación debe darse con la celebración del juicio plenario.

En cuanto a las determinaciones de hechos adicionales relacionadas a los edictos de subasta, Caparra 5 solicitó que fueran añadidos los que siguen: (1) que los edictos incumplieron con la Regla 51.8 de Procedimiento Civil, *supra* y el Artículo 102 de la Ley 210-2015, *supra*; (2) de los edictos surge que las propiedades estaban libre de cargas y gravámenes; (3) los edictos exponen que el comprador no será responsable del pago de los *junior liens*; (4) la sentencia obtenida por el Consejo de Titulares en el caso KCD2014-0081 fue anotada posterior al crédito que Condado 3 se encontraba ejecutando; y (5) no se incluyó en el edicto de las subasta la suma de la deuda por cuotas de mantenimiento. Pero tampoco apreciamos abuso de discreción del foro primario al no acoger la inclusión de los hechos adicionales promovidos por la apelante, ni juzgamos que la prueba documental ante nuestra consideración justifique que lo hagamos en esta etapa apelativa.

### b.

Los señalamientos de error segundo y tercero son susceptibles de discusión conjunta y así obraremos. Caparra 5 arguye que el TPI incidió al determinar que los edictos publicados en el procedimiento de ejecución de sentencia no produjeron la nulidad de las subastas. Afirma así, porque, según interpreta, en los edictos no se identificó carga o gravamen preferente alguno. En la misma tónica, manifiesta que la única mención de cuotas de mantenimiento contenida en los edictos refirió a la sentencia en el caso del Consejo de Titulares, la cual identificó la deuda como un gravamen posterior y *junior liens*. Además, arguye que de los propios edictos surgía que las propiedades se adquirirían *libre de cargas y gravámenes*.

Abunda en lo dicho aludiendo al Artículo 102 de la Ley Hipotecaria, *supra*, que exige que se describan los gravámenes preferentes, así como los anteriores, y se incluya la suma o el monto de estos, por lo que la omisión de información al respecto en los edictos constituye un error sustancial que acarrea la nulidad de la subasta. En la alternativa, asevera que, cuando no se especifica un gravamen preferente o se omite, entonces ello se convierte en un gravamen o vicio oculto que debe ser resarcido. Por último, se reitera en la afirmación de que, de haber sido alertada en el edicto de la deuda por cuotas de mantenimiento, no hubiese comprado por subasta las propiedades.

A esto riposta Condado 3 que el referido Artículo 102 de la Ley Hipotecaria requiere que se incluya en el edicto las cargas preferentes, tales como las hipotecas inscritas, pero no que se incluyan los gravámenes preferentes, como los son las hipotecas legales. A juicio suyo, de la Exposición de Motivos de la Ley Hipotecaria, *supra*, surge que las obligaciones personales no tienen acceso al registro, por lo que las cargas deben aparecer registradas en la finca y no en abstracto. De este

modo, la Ley Hipotecaria requiere que el promovente de una ejecución de un inmueble incluya en el edicto las cargas preferentes inscritas en el Registro de la Propiedad que subsistirán luego de adjudicada la subasta y las cuales serán aceptadas por el licitador, no los gravámenes que por disposición legislativa afectan preferentemente los inmuebles.

También, Condado 3 esboza que los titulares tienen el deber primordial de pagar las cuotas de mantenimiento para sufragar los gastos comunes. A su vez, expresa que el ordenamiento jurídico ha dotado dicha obligación como un crédito preferente. A raíz de ello, razona que la deuda por cuotas de mantenimiento constituye un gravamen sobre el apartamento, lo cual incide en que el adquiriente tenga una responsabilidad solidaria de satisfacer las cuotas adeudadas. Añade que, el hecho que Caparra 5 voluntariamente hubiese comparecido a la subasta con la intención de licitar, en efecto compitiendo y licitando, lo convirtió en un adquiriente voluntario de los inmuebles. Cónsono con lo anterior, sostiene que, conforme al propio edicto, Caparra 5 aceptó y quedó subrogado en la responsabilidad de todas las cargas y gravámenes preferentes que afectan las propiedades, por lo que asumió responsabilidad de tales gravámenes, independientemente de que constaran anotados como cargas en el Registro de la Propiedad.

Resaltó Condado 3 además, que de los edictos de subasta se desprendía que *se entenderá que todo licitador acepta como bastante la titulación y que las cargas y gravámenes anteriores y los preferentes, si los hubiese, al crédito ejecutante, continuarán subsistentes entendiéndose que el rematante los acepta y queda subrogado en la responsabilidad de los mismos, sin destinarse a su extinción el precio del remate.* Por tanto, argumenta que el edicto apercibió al posible licitador sobre la necesidad de verificar, no solo las cargas preferentes que surgían del Registro de la Propiedad, según incluidas en el Aviso de Subasta, sino de verificar los

gravámenes preferentes que, por disposición legislativa, afectan a todos los inmuebles sitos en Puerto Rico.

Por último, Condado 3 expuso que los edictos de subasta cumplieron cabalmente con los requisitos estatutarios establecidos en nuestro ordenamiento jurídico, al describir adecuadamente el inmueble siendo hipotecado, incluir su precio mínimo, informar sobre los acreedores posteriores, en adición de apercibir al licitador sobre los riesgos y consecuencias de los gravámenes preferentes.

Por otro lado, el señor Ramírez de Arellano y SARLAW, LLC adujeron que la Ley de Condominios, *supra*, establece la deuda por cuotas de mantenimiento como un gravamen preferente que recae exclusivamente sobre el apartamento correspondiente, no obstante, la propia ley establece unas excepciones que posponen tal prelación. De acuerdo con lo cual, sostienen que el Consejo de Titulares puede recobrar preferentemente tal deuda contra cualquier titular, excepto cuando haya créditos a favor del Estado, de un asegurado, o de un acreedor hipotecario debidamente inscrito en el Registro de la Propiedad, tal como ocurrió en el caso de marras.

En armonía con dicha argumentación, estos apelados aducen que Condado 3 tenía el crédito hipotecario debidamente inscrito a su favor, por lo que la deuda por cuotas de mantenimiento quedó relegada en cuanto a prelación de cobro, en virtud del Artículo 40 de la Ley de Condominios, *supra*. Por tanto, la deuda por cuotas de mantenimiento no debe entenderse como una carga preferente al crédito hipotecario ejecutado que produjo la celebración de subastas impugnadas, por lo que no tenían que ser incluidos en los edictos de la subasta.

Agrega que la deuda impugnada no es un mero gravamen posterior susceptible de cancelación durante la venta en pública subasta, sino que la Ley de Condominios, *supra*, estableció la deuda por cuotas de

mantenimiento como un gravamen legal que pesa sobre los apartamentos sometidos al régimen de propiedad horizontal, siendo responsable de su pago cualquier titular que advenga propietario del dominio de ellos. Es decir, por ser gravámen de carácter legal, su responsabilidad es total y solidaria, inconsecuentemente de si dicha deuda esté inscrita o no en el Registro de la Propiedad, existiendo tal deuda independientemente de su estado registral. A lo que añade que Caparra 5 contaba con los medios y el tiempo suficiente para conocer la deuda impugnada.

a.

No existe controversia de que, previo a celebrar una subasta, es requisito legal que se publique un edicto que se conforme a los requisitos que dimanan de las Reglas de Procedimiento Civil, *supra.* En lo puntual, la Regla 51.7 de Procedimiento Civil, *supra,* regula el procedimiento de las ventas judiciales y requiere que el aviso de venta describa adecuadamente los bienes que se venderán, y hará referencia a la sentencia que satisfará mediante dicha venta, expresando a su vez, el sitio, el día y la hora en que se celebrará la misma.

A lo anterior se une que el Artículo 102 de la Ley Hipotecaria, *supra,* que dispone cuál deber ser el contenido del edicto, en los siguientes términos:

1. Que los autos y todos los documentos correspondientes al procedimiento incoado estarán manifiesto en la secretaría del tribunal durante las horas laborables.
2. Que se entenderá que todo licitador acepta como bastante la titularidad y que las cargas y gravámenes anteriores y los preferentes, si los hubiere, al crédito del ejecutante continuarán subsistentes. Se entenderá, que el rematante los acepta y queda subrogado en la responsabilidad de los mismos, sin destinarse a su extinción el precio del remate.
3. La suma de cada carga anterior o preferente, el nombre o nombres de sus titulares y fecha o fechas de vencimiento.
4. La descripción de los bienes o derechos reales objeto de subasta, el precio mínimo del remate y los restantes detalles complementarios sobre la subasta, tales como el día, hora y sitio en que se efectuará el remate.

5. Todos los nombres de los acreedores que tengan inscritos o anotados sus derechos sobre los bienes hipotecados con posterioridad a la inscripción del crédito del ejecutante, o de los acreedores de cargas o derechos reales que los hubiesen pospuesto a la hipoteca ejecutada y las personas interesadas en, o con derecho a exigir el cumplimiento de instrumentos negociables garantizados hipotecariamente con posterioridad al crédito ejecutado, para que puedan concurrir a la subasta si les convenga o satisfacer antes del remate el importe del crédito, de sus intereses, costas y honorarios de abogados asegurados, quedando entonces subrogados en los derechos del acreedor ejecutante.

6. Se expresará que la propiedad a ser ejecutada se adquirirá libre de cargas y gravámenes posteriores.
*Íd.*

Habiendo auscultado los edictos de subasta pertinentes, coincidimos con la apreciación del foro apelado al resaltar de que ambos contenían la advertencia sobre los dictámenes judiciales que dispusieron sobre el cobro de las cuotas de mantenimiento pendientes de pagar. Sin duda, en los edictos también se incluyó la indicación de que la propiedad se adquiriría libre de cargas y gravámenes, cumpliendo con el último de los requisitos antes citados, pero ello no supuso la eliminación de la deuda por cuota de mantenimiento.

Sobre la última oración que precede, coincidimos con el foro apelado al este apreciar que, adquiridos por Caparra 5 los referidos inmuebles mediante el procedimiento de subasta, éstos fueron liberados del gravamen anotado de la *Sentencia* en el caso KDC2014-081 como gravamen posterior o *junior liens*, pero la deuda por cuotas de mantenimiento subsistió. Esto, por cuanto el artículo 40 de la Ley de Condominios, *supra*, establece que el crédito contra cualquier titular –por su parte en el pago de las cuotas de mantenimiento por los gastos comunes– tendrá preferencia sobre cualquier otro crédito de cualquier naturaleza excepto: los créditos a favor del ELA y la correspondiente municipalidad por el importe de los últimos cinco (5) años; la prima del seguro de (2) años del apartamiento, y en caso de seguro mutuo, los últimos dos dividendos que hubiesen repartido; y los créditos

hipotecarios inscritos en el Registro de la Propiedad. 31 LPRA sec. 1293d.

Igualmente, el Artículo 41 de la Ley de Condominios, *supra,* le impone responsabilidad solidaria a quien adquiere un apartamiento, el cual, junto con el transmitente, deberá responder por el pago de las cuotas atrasadas al momento del traspaso de titularidad. Específicamente, el artículo 41 establece que:

> La obligación del titular de un apartamento por su parte proporcional de los gastos comunes constituirá un gravamen sobre dicho apartamento, una vez anotado en el Registro de la Propiedad. Por lo tanto, luego de la primera venta, **el adquirente voluntario de un apartamento será solidariamente responsable con el transmitente del pago de las sumas que éste adeude**, a tenor con el Artículo 39 de esta Ley, hasta el momento de la transmisión, sin perjuicio del derecho del adquirente a repetir contra el otro otorgante, por las cantidades que hubiese pagado como deudor solidario. Sin embargo, un adquirente involuntario será responsable solamente de las deudas por gastos comunes surgidas y no satisfechas durante los seis meses anteriores al momento de adquirir la propiedad en adición al balance corriente que se acumule desde la adquisición de dicho inmueble por parte del adquiriente involuntario. Para efectos de lo anterior, es adquiriente involuntario el acreedor hipotecario que en cobro de su crédito adquiere un inmueble sujeto a esta Ley, el cual pagará mensualmente o en el término establecido por el Consejo de Titulares. *Íd.*

(Énfasis provisto).

Cónsono con lo anterior, nuestro Tribunal Supremo ha reiterado que son adquirientes voluntarios los: (1) compradores, donatarios, permutantes o (4) **aquel que se lleva la buena pro de una subasta pública**; (2) quien adquiere el crédito hipotecario o el apartamento con el ánimo de hacer un buen negocio; (3) quien tiene la oportunidad y los medios de enterarse de la deuda por gastos comunes del condominio, y (4) quien tiene el poder de decisión para asumirlos como gravamen del inmueble que adquiere. (Énfasis provisto). *Con. Tit. Centro Int'Torre II v. PRCI,* 210 DPR 403, 417 (2022), citando a *Condominio First Federal v. LSREF2,* supra, en la pág. 949; *Asoc. de Condómines v. Naveira,* supra, en la pág. 97.

Entonces, aunque la apelante argumenta que la deuda por cuota de mantenimiento quedó eliminada luego de celebrarse la subasta, debido a que era un gravamen posterior o *junior liens,* nuestro ordenamiento establece la obligación del **adquiriente voluntario** sobre las sumas que se adeuden por cuotas de mantenimiento. De acuerdo con el Artículo 41 de la Ley Hipotecaria, *la obligación del titular de un apartamento por su parte proporcional de los gastos comunes **constituirá un gravamen sobre dicho apartamento**, una vez anotado en el Registro de la Propiedad.* 31 LPRA sec. 1293e. A tenor, desde que las propiedades se inscribieron en el Registro de la Propiedad, llevaban consigo el gravamen estatutario del pago de las cuotas de mantenimiento, lo que resultaba en que el adquiriente voluntario fuera responsable solidariamente del pago de las sumas adeudadas.

De tal manera: Caparra 5 adquirió las propiedades mediante subasta pública; en carácter de adquiriente voluntario; tuvo la oportunidad de conocer la deuda por gastos comunes y así determinar si asumirlos o no como gravamen de las propiedades. Al comprador de un apartamento de un edificio sometido al régimen de propiedad horizontal se le puede oponer o imputar el conocimiento de las circunstancias de particulares de la propiedad. *García Larrinua v. Lichtig,* 118 DPR 120 (1986). Cabe resaltar, que nuestro ordenamiento permite que el apelante pueda repetir contra el otorgante, por las cantidades que hubiese pagado como deudor solidario.

Por todo lo anterior, examinado el razonamiento jurídico empleado por el foro primario al disponer la *Sentencia Parcial,* no apreciamos allí que hubiesen intervenido los errores señalados, de modo que cabe confirmar.

**IV. Parte dispositiva**

Por los fundamentos expuestos, se confirma la *Sentencia Parcial* apelada.

Lo pronunció y manda el Tribunal y lo certifica su Secretaria.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

**IV. Parte dispositiva**

apelada.